## CHARLESTON.

W. L. WARDEN v. WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS.

Submitted February 15, 1921. Decided February 22, 1921.

1. RAILROADS—*Not Liable for Killing Cow on Railroad Crossing, Where Collision Inevitable.*

The killing of a cow by a motor, hauling a train of loaded cars, where it is shown by positive evidence that the cow came from behind a plank fence where she was hid from the view of the motorman, and onto the railroad crossing about thirty feet before the rapidly moving train, making it impossible to prevent the killing, although the service brakes were immediately set, will not justify a verdict and judgment against the railroad company for negligence, although it appeared from the evidence that the crossing could have been seen by the motorman, by aid of the headlight, for a distance of one hundred and fifty yards or more. (p. 758.)

2. SAME—*Stock Law Does Not Relieve Railroad from Duty of Keeping Reasonable Lookout.*

Section 3, chap. 59 of the Acts of 1919, making it unlawful for horses, cattle, etc., to run at large on a railroad right of

way and fixing a penalty on the owner if injury to property results therefrom, does not relieve a railroad company from the duty of keeping a reasonable lookout for such animals upon its tracks.  (p. 762).

Error to Circuit Court, Mercer County.

Action by W. L. Warden against Walker D. Hines, Director General of Railroads.    Judgment for plaintiff, and defendant brings error.

*Reversed and remanded.*

*Reynolds & Reynolds,* for plaintiff in error.
*John Kee,* for defendant in error.

Lively, Judge:

This writ of error and supersedeas brings up for review a judgment of the Circuit Court of Mercer County, rendered against plaintiff in error on June 4, 1920.

W. L. Warden owned two milch cows and on the evening of October 6, 1919, drove them in his cow pen at Nemours in Mercer County, and next morning, finding the cows had gone out of the gate, some one having carelessly left it open, tracked them down toward the railroad track of the N. & W. Ry. Co., a distance of about 500 yards.   One of the cows had gone to the railroad crossing, where she had been struck by a west bound railroad train, and she was found about one hundred yards west of the crossing.   The other cow had crossed the railroad right of way fence, which had been partially torn down, some distance east of the crossing, walked a short distance toward the crossing and went upon the track about 30 feet east of the crossing, where she had been struck by a railroad train and dragged about 20 yards beyond the crossing. On each side of the railroad a board fence four or five feet high extended from the right of way wire fence and immediately east of the county road to a cattle guard at or near the edge of the public crossing.   From the crossing to the eastward the railroad tracks curved to the left, and there is some conflict as to the degree of curve, some of the witnesses saying it was a slight curve, and others saying it was a nine degree curve. There was nothing to obstruct the view from this board fence at

the crossing for a distance of about 150 yards eastward. After showing these facts, and the value of the cows killed, which he placed at $125.00 each, the plaintiff below rested his case.

The engineer or motorman was examined, who testified that he was on a westbound train as motorman on the night of October 6, 1919, which passed over this crossing at 5:30 in the morning. He was hauling about 25 or 30 loaded cars, was at his post in front of the motor, and was leaning out of the window watching the track ahead. He said: "I went around something like a nine degree curve and I struck this cow on the road crossing, but I didn't see this cow until I got nearly on·her, because she come out from the fence and walked on the railroad crossing just as soon as I got about a car length from her, and I drug her about 150 yards west." In answer to a question propounded by the judge asking where the cow was when he first saw her, he replied: "She walked out from the fence, there is a fence on each side of the cattle guard." His evidence in substance was, that he was about a car length from the cow when he saw her walk on the track, that he immediately applied the service brake; that it was impossible for him to stop the train in that distance; that he never saw but one cow there; that he did not kill but one cow; that he did not hit a cow east of the crossing; and that he had had 16 years experience as an engineer.

The motorman was the only one who saw the accident. The fireman was attending to his duties looking over the machinery of the electric motor, and saw nothing of the cows, and did not know one was killed until the train stopped, and the cow was removed from the pilot.

There was considerable conflict as to the degree of the curve east of the crossing, and as to how far the headlight would lighten the track ahead of the motor. Several witnesses testified that for about 150 yards east of the crossing, from a signal (which they called "the paddle") the headlight would light the track to the crossing. The engineer or motorman at first said the headlight would light the track ahead of his motor about 30 feet, but afterwards, just before the case was submitted to the jury, upon his request, and by permission of the court, he corrected his testimony by saying that the headlight would light

up the track from 200 to 250 feet; that he had made a mistake when on the stand, had become confused, and having stated the distance of 30 feet, he concluded to "stick to it," until after having time to "think it over", he desired to make the correction.

We do not think it is very material to this case as to whether the curve was slight or great; or whether the headlight shone on the track for a greater or less distance. If it had been bright daylight and on a straight track, it does not appear that the accident could have been avoided. The only cow that was seen was the one which came out from behind the board fence and walked on the track immediately in front of the motor. There is no evidence that this train killed the cow which was struck east of the crossing. If so, it was not known to the train crew, and the engineer testified he was at his post and watching the track ahead. It is to be presumed that other trains passed that way. The only evidence we have is that both cows were in the cow lot that night, and their tracks led to the railroad, but whether they went singly or together does not appear. Whether they were on the track together and killed by the same train is only an inference. They were found dead after daylight, but whether killed at one time or at different times is very uncertain. Besides, it is shown by the plaintiff that he tracked the cow which had wandered through the right of way wire fence east of the crossing, and she was struck where she had come onto the track. There was nothing to show that she had been standing or running on the track. As the record does not disclose whether or not she came suddenly on the track before this train, or what train killed her, can we say that she was negligently killed? The burden of proof is on the plaintiff. *Underwood* v. *C. & O. Ry. Co.,* 78 W. Va. 109; *Harvey Coal and Coke Co.* v. *C. & O. Ry. Co.,* 69 W. Va. 228; *Layne* v. *Ohio River R. R. Co.,* 35 W. Va. 438. There is no material disagreement about the controlling facts concerning the cow which was struck as she came on the crossing. The night was dark, the cow was first seen when about a car length from the motor; she came out from behind a board fence four or five feet high, and it was impossible to stop the heavily loaded train in that distance. No one disputes this evidence. The physical

facts do not contradict it, on the contrary they corroborate. If the accident did not so occur, as shown by this witness, can we go into the realm of fancy or speculation and say how it occurred? Is there any tangible evidence on which we can say that this engineer was negligent or that he wantonly killed this cow? He was at his post of duty and watching the track ahead. Serious railroad wrecks have occurred and human lives have been lost by such accidents, and we must credit the engineer with some instinct of self-preservation, as well as a consideration for the preservation of the lives of his train crew. But of course this is not controlling on the question of negligence, although it is entitled to some weight. A reckless disregard for human life should not be presumed. In *Carper* v. *Traction Co.,* 78 W. Va. 282, this court sustained a demurrer to the evidence under circumstances and facts somewhat similar to those here. The steer in that case either got up from lying on the right of way, or came over the top of the fill, about 50 feet from the car and ran about the same distance, when it attempted to cross the track. Expert witnesses testified that at a point in the curve a distance 350 or 400 feet from where the steer appeared to the motorman he could have seen it if he had been on the lookout. *Christian* v. *Railway Co.,* 78 W. Va. 379, is a case in point. The engineer was on the lookout and the train going around a curve, when he observed something in the bushes near the place where the two horses were killed. He did not see the horses, and did not know he had struck them. Plaintiff's witnesses testified that an object could be seen on that particular curve 570 feet before reaching the point where the horses were killed. This court held that a peremptory instruction should have been given for the defendant. It has been often reiterated by our decisions that it is the duty of trainmen, consistently with their train duties, to keep a lookout for domestic animals upon the track, and avoid killing them, and, if they fail to use ordinary care, the railroad company is liable, though they may not have seen the animals in time to avoid killing them. But the care to be exercised is ordinary, not extraordinary.

We are cited by plaintiff's counsel to *Whelan* v. *B. & O. Ry. Co.,* 70 W. Va. 442; *Kay* v. *Director General,* 86 W. Va. 93;

*Underwood* v. *C. & O. Ry. Co.,* 78 W. Va. 409; and *Gould* v. *Coal & Coke,* 74 W. Va. 81, as supporting the proposition that the evidence was sufficient to support this verdict. In the Whelan case the horse was killed in the daytime on a track where it could have been seen 350 to 400 yards and no effort whatever was made to stop the train, or blow the whistle. On the contrary the speed of the train was accelerated within this distance, and by ordinary care the train could have been stopped and the accident prevented. In the Kay case no witness saw the accident; but it occurred on a straight track where the cattle had been for several minutes before they were struck. The defendant did not introduce the trainmen as witnesses. Direct evidence was withheld by the railroad company. This was significant. Judge POFFENBARGER said in his opinion: "The theory of the sudden entry of the cattle on the track in front of the train, which, if sustained by positive evidence or presumption, would class the case with *Harvey* v. *C. & O.,* 69 W. Va. 228; *Lovejoy* v. *C. & O.,* 41 W. Va. 693 and *Toudy* v. *N. & W.,* 38 W. Va. 694, is negatived and excluded by facts tending to prove they had been on the track for several minutes before they were struck." In the Underwood case there was no direct evidence of the killing, but the facts tended to show that one cow had been standing on a platform near the track, "had got up to cross the track when the train struck her"; and as to the other cow there was no evidence to show whether she was killed in the daytime or nighttime or what train killed her. She was found opposite a curve on a steep bank, on a steep hillside, and there was some evidence that she had been feeding near the track. The verdict was set aside. The Gould case has no application here. The trainmen did not see the horse, were insensible of having struck a horse at the time alleged, and it was not certain whether the horse had been struck by a train or had received his injuries on a nearby trestle. The evidence was insufficient and the judgment of the lower court was reversed for that reason. Wherever it is shown by positive evidence that the animal killed has suddenly appeared and attempted to cross the track, and that the train could not have been stopped in time to prevent the accident, and that the trainmen were on the lookout for dumb animals

on the track consistently with their other duties, and, using ordinary care, failed to see the animal, this court has repeatedly said that negligence was not sufficiently shown to sustain a verdict for damages.

The point is made that the motor was not equipped with a proper and sufficient headlight to enable the motorman to see the cow on the track or near the track in time sufficient to avoid killing her. While the motorman was evidently confused as to the distance which the headlight would illumine the track, it was apparent that there was nothing wrong with the light. It was shown that the one on this motor was the usual ordinary one with which the defendant equipped its motors, and a number of the plaintiff's witnesses testified that the headlights on these motors would shine from the paddle to the crossing, a distance of about 150 yards. The motorman afterwards, upon his own request and consent of the court, corrected his evidence and gave the reason for his error in his testimony given at an earlier period of the trial. On this point the plaintiff relies on the case of *Hanger Bros.* v. *Railway Co.,* 70 W. Va. 212, where the front of the train had no headlight whatever. The train was backing in the dark when the horse was killed. But in the case here it is shown that the cow was behind a board fence and walked out on the track immediately in front of the train, and it is not perceived how the accident could have been prevented if the headlight was of more or less intensity and brilliancy, or even if the accident had occurred in the bright light of day.

Sec. 3, chap. 59, Acts 1919, which says, "It shall be unlawful for any such animal (horse, cattle etc.) to run at large on any public road or highway, or railroad right of way in this state, and should such stock while running at large destroy or injure the property of another, the owner shall be guilty of a misdemeanor and fined not less than five dollars and not more than ten dollars, and shall pay to the party whose property shall have been injured or destroyed, the amount of damages sustained by him by reason of such destruction or injury," is relied on, with the argument that this statute relieves the railroad company from observing the care with respect to such animals when found on the track or right of

way, heretofore imposed; that it should be considered as an element in ascertaining negligence, inasmuch as the trainmen may presume that no such animals will be found on the railroad right of way.  We do not think this statute can be construed as a relaxation of the rule laid down that the trainmen must keep a lookout for dumb animals upon the track, consistent with their other duties, and avoid the injuring or killing of them by the use of ordinary care.  They must use care and diligence to discover such animals, and to prevent injuring or killing them, if by the use of ordinary care and prudence it can be done, after discovering them, and if they do not do so, the railroad company is liable.  The fact that plaintiff negligently allowed his cows to get out of his enclosure and stray down to the railroad track does not in itself preclude recovery.  It was not the proximate cause of the injury.  It is within common knowledge that cattle will often )escape from their enclosures, even where more than ordinary means have been taken to prevent them from so doing.  We think the controlling facts in this case bring it within the control of principles announced in *Carper* v. *Traction Company,* 78 W. Va. 282 and *Christian* v. *C. & O. Ry. Co.,* 78 W. Va. 378 and the cases there cited, and are of the opinion that defendant's peremptory instruction should have been given.

*Reversed and remanded.*